312 Ga. 134
FINAL COPY

S21A0159.  FITTS v. THE STATE.
S21A0160.  FRANKLIN v. THE STATE.

BETHEL, Justice.

In these related appeals, Donovan Raishad Fitts and Jermanique Vashon Franklin appeal their convictions for murder and other crimes in connection with the shooting deaths of Tenecia Posley and Barry Johnson.[1] In Case No. S21A0159, Fitts asserts

---

[1] The crimes occurred on March 4, 2015. On January 26, 2017, a Warren County grand jury indicted Fitts, Franklin, and DeAundre Ross for two counts of malice murder, felony murder, burglary in the first degree, aggravated assault, and possession of a firearm during the commission of a felony and one count each of armed robbery, false imprisonment, and home invasion.

Following a six-day joint trial ending on August 28, 2017, Ross was acquitted after he presented evidence that while the murders were being committed, he was in another county for a court calendar call related to another crime. However, the jury found Fitts guilty of all counts, and he was sentenced to serve consecutive life sentences without parole for each count of malice murder, another consecutive life sentence for armed robbery, ten years in prison to be served consecutively for false imprisonment, another consecutive life sentence for home invasion, and five years in prison to be served consecutively for each possession count. The other counts were either merged or vacated by operation of law. Fitts moved for new trial on September 6, 2017, and amended his motion on August 7, 2019. The trial court held a hearing on January 7, 2020, and denied his motion for new trial on February 6, 2020. Fitts timely filed a notice of appeal.

The jury found Franklin guilty of both counts of felony murder, one count of burglary, and armed robbery, but acquitted her of the other charges.

that the trial court erred in admitting evidence of a subsequent shooting incident as intrinsic evidence and as other-acts evidence under OCGA § 24-4-404 (b) and that his trial counsel rendered ineffective assistance for failing to object to certain hearsay testimony and for not moving for a mistrial. In Case No. S21A0160, Franklin claims that the evidence was insufficient to convict her beyond a reasonable doubt as a party to the crimes, that the Court should reconsider the standard of review for sufficiency, and that she received ineffective assistance of counsel at trial.

As to Fitts, we discern no reversible error, so we affirm in Case No. S21A0159. As to Franklin, we reject each of her enumerations of error, but we have found a merger error with regard to her convictions for armed robbery and burglary. We therefore affirm her

Franklin was sentenced to two life sentences to be served concurrently for the felony murders, twenty years in prison to be served consecutively for burglary, and a third life sentence for armed robbery to be served concurrently. On September 15, 2017, Franklin filed a motion for new trial, which was amended twice. After a hearing, the trial court denied her motion for new trial on February 7, 2020, and Franklin timely appealed to this Court. These cases were docketed to the term of court beginning in December 2020, consolidated for review, and submitted for a decision on the briefs.

convictions for felony murder but vacate her convictions for armed robbery and burglary in Case No. S21A0160.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial shows that Fitts and Franklin started dating in late 2014 and began living together in early 2015.[2] The couple resided at the home of Fitts's godmother, Melba Ansley, who testified that Franklin, who was a nurse's assistant, moved in to care for her after her recent heart surgery. Ansley also testified that she considered Fitts to be her son, he had lived with her since he was 12 years old, and she allowed him to use her cell phone and her truck. Fitts's friend DeAundre Ross, who was dating Franklin's sister, often visited Fitts at Ansley's home.

During this time, Franklin was having an affair with Damian Calvin. Franklin had previously lived with Calvin at his house and was familiar with some drug activity occurring there. Calvin was a drug dealer, and he kept illegal drugs in his house. The two had

_____

[2] The couple were married in September 2015, six months after the crimes at issue.

plans to meet at a hotel about 45 minutes away on March 3, 2015, but Franklin rescheduled for the morning of March 4. Midmorning that day, right before she met Calvin at the hotel, phone records showed that Franklin called Fitts once on Fitts's own phone and several times on Ansley's phone, which was prepaid and therefore had no subscriber information.[3] The cell-site location information for Fitts's phone placed him near Calvin's house during this time. Franklin testified that Fitts was using Ansley's phone because his own was broken. The two had no contact again until 11:22 a.m., when Fitts used Ansley's phone to call Franklin. Franklin testified that the phone calls were about repairs for Ansley's truck.

While at the hotel with Franklin, sometime between 11:00 a.m. and 11:20 a.m., Calvin received a call from Johnson, who said he was on Calvin's front porch. Johnson was a regular customer of Calvin. Calvin told Johnson that he was not there and to come back another time. Roughly ten minutes later, Calvin's cousin, Keith Robertson,

---

[3] At the time of his arrest several months later, Fitts provided the number for Ansley's prepaid phone as his phone number.

4

called Calvin to tell him that, as he was driving past Calvin's house, he saw two men run from the house toward a truck parked across from Calvin's driveway in a sandpit. Robertson turned around so that he could go back to check on Calvin's house and then saw the truck leave the sandpit.[4] On the phone, Calvin asked Robertson to check on both Calvin's son and Posley, who was Calvin's girlfriend at the time, inside the house. After driving up Calvin's driveway, Robertson saw Johnson dead on the front porch, still holding his cigarettes and keys. Robertson called for Posley, heard no reply, and told Calvin to hurry home. Robertson then called 911 at approximately 11:30 a.m. and waited at the end of Calvin's driveway for the police to arrive.

The police found the house thoroughly ransacked. The police also discovered shoeprints leading from an abandoned house next door through the woods to Calvin's back door, where someone had

---

[4] Neighbors testified that they noticed a truck parked in the sandpit that morning where they rarely, if ever, saw vehicles parked. One neighbor testified that he saw the truck leave shortly after 11:00 a.m. Detectives later discovered that the tires from Ansley's truck matched the make and size of the tire prints from the truck parked in the sandpit on the day of the murders.

used a brick to break in. The police discovered Posley, who had been shot five times, on the floor in the corner of a bedroom, tightly bound with zip ties. Calvin's two-year-old son was found unharmed on the bed. Johnson had been shot eight times through the glass front door. Calvin testified that his drug merchandise and between $8,000 and $9,000 in cash were missing after the incident. A GBI firearms examiner testified that bullets and shell casings found at Calvin's house were all from the same gun; the police also later found shell casings from this gun both at Ansley's house[5] and at the scene of a subsequent shooting incident where both Fitts and Ross were present.

After leaving the hotel, Franklin called Calvin a few times, starting at 11:27 a.m. In the afternoon, Fitts and Franklin met at the home they shared with Ansley and took Ansley's truck for repairs. Franklin testified that, on their way home, they picked up Ross and that Fitts and Ross spent the rest of the day at Ansley's

---

[5] Ansley testified that Fitts and Ross would occasionally engage in target practice in the yard.

house. That evening, GBI agents interviewed Franklin to corroborate Calvin's alibi. Franklin was not considered a suspect at that time. During that interview, she identified her boyfriend as "Donovan Ansley," but gave his correct address.

Franklin did not continue her physical relationship with Calvin after the shootings. However, she asked him as often as every other day about whether there were leads in the case.

In October 2015, the GBI executed a search warrant at Ansley's house. In November 2015, Franklin agreed to be interviewed by the GBI. Franklin claimed that on the day of the crimes, she and Fitts returned straight home after dropping off Ansley's truck for repairs, and that Fitts then stayed in his room. She made no mention of Ross at that time. The police later arrested Fitts and Franklin.

While Fitts was in jail in March 2017, his sister asked him in a recorded call, "So you did the shooting?" Fitts responded, "No, but I was there, and I had a big part in it. Not with that one anyway." Fitts's sister asked why Fitts would "do something like that," referring to the crimes. Fitts recounted how badly he needed money

but that the crime "wasn't supposed to go like that." Fitts said that he knew what he did, that his situation pushed him to do certain things that he would not normally do, and that remembering the murders would eat him up when he was not busy or distracted.

At trial, following the close of the State's case-in-chief, Franklin moved for a directed verdict of acquittal under OCGA § 17-9-1 (b). The trial court denied the motion at that point. Fitts declined to testify, but Franklin testified in her defense and denied participating in planning the crimes.[6] Franklin testified that, unknown to Fitts, she and Calvin had secretly planned to meet for sex, that she had no knowledge that the crimes were being committed during her tryst with Calvin, and that she could not account for why Fitts had decided to commit the crimes at Calvin's home during that same time frame.

*Case No. S21A0159*

---

[6] Fitts does not contest the sufficiency of the evidence to support his convictions, and for non-death penalty cases that were docketed to the term of court beginning in December 2020, we no longer routinely conduct a sua sponte sufficiency review. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020).

1. Fitts asserts that the trial court erred by admitting evidence of a March 31, 2015 shooting incident, which the court admitted as intrinsic evidence or, alternatively, as evidence of other acts under OCGA § 24-4-404 (b), and in charging the jury on the limited purpose of this evidence. We conclude that this claim does not require reversal because any error was harmless to Fitts.

A few weeks after the murders, DeAundre Ross, who was Fitts's and Franklin's co-defendant, was driving an SUV with his brother as a passenger, while Fitts was driving a separate vehicle behind them. Ross exchanged gunfire with a third party, leaving shell casings on the street and inside the SUV. After the shooting, Ross's SUV broke down due to a bullet hole in its gas tank, so Fitts gave Ross and Ross's brother a ride back to Ross's father's house. Law enforcement officers later determined that the shell casings from this shooting incident matched the casings found at the scene of the murders and at Ansley's home where Fitts lived and Ross often visited, meaning that the same gun had been used at all three locations.

9

Before trial, the State filed a notice of intent to present evidence of the shooting incident under OCGA § 24-4-404 (b) ("Rule 404 (b)"), and after a hearing, the trial court ruled that the evidence was admissible as intrinsic evidence or, alternatively, under Rule 404 (b). Assuming without deciding that the evidence of the shooting incident was admitted in error, this error was harmless to Fitts. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) *Taylor v. State*, 306 Ga. 277, 283 (2) (830 SE2d 90) (2019). When applying a harmless-error analysis, we review the evidence de novo and weigh it as a reasonable juror would rather than in a light most favorable to upholding the jury's guilty verdict. See id.

Here, the State relied heavily on the evidence of the subsequent shooting to try to prove Ross's participation in the murders, and the evidence presented only indirectly implicated Fitts in the shooting. At trial, the State presented evidence that Fitts was driving behind Ross's SUV when Ross used a gun in the shooting,

that the gun was the same one that was used in the murders three weeks earlier and at Ansley's house where Fitts lived and Ross often visited, and that Fitts later drove Ross and Ross's younger brother home. However, there was no evidence presented at trial that Fitts handled the gun during the shooting incident or was otherwise involved in that shooting, or that Fitts was investigated for any crime in relation to the shooting, unlike Ross.

In its closing argument, although the State argued that Fitts was with Ross "doing another shooting together" when the murder weapon was used in the shooting incident, the State emphasized the shooting evidence with respect to Ross, saying multiple times that the gun belonged to Ross and that it was Ross's personal weapon that he would not have shared. And the trial court gave a limiting instruction in the final jury charge directing the jurors to consider the State's evidence of other crimes only insofar as it related to the issues of knowledge, intent, and participation in a conspiracy.

In contrast to Fitts's tenuous connection to that shooting incident, the evidence presented at trial as to Fitts's guilt for the

11

murders was strong. Most significantly, in the recorded jail phone calls with his sister, Fitts admitted to playing a "big part" in the crimes (although he denied shooting the victims), gave his motive for the robbery, and said that he felt guilty about his participation. Also, the tire tracks found at the scene were consistent with the tires on Ansley's truck that Fitts drove, and cell-site location data placed Fitts in the vicinity of Calvin's house during the crimes. Therefore, we conclude that under the circumstances of this case, it is highly probable that the admission of the evidence concerning the later shooting incident did not contribute to the jury's verdicts. See *Lofton v. State*, 309 Ga. 349, 356-358 (3) (b) (846 SE2d 57) (2020) (error was harmless where prosecution presented strong independent evidence of guilt, jury properly learned that appellant had access to murder weapon, evidence was not significantly relied on in State's closing argument, and "any harm . . . was lessened because the State did not try to use the [evidence] to establish that Appellant rather than [his co-defendant] was the shooter"); *Taylor*, 306 Ga. at 283 (2) (error was harmless because the evidence was strong and there was no

12

contention that prosecution heavily relied on erroneously admitted evidence in closing argument).

2. Fitts asserts that he was denied constitutionally effective assistance of counsel when his trial counsel failed to object to hearsay testimony he claims was barred by the Confrontation Clause of the United States Constitution and to move for a mistrial. We disagree.

To prevail on this claim, Fitts must establish both that his representation was professionally deficient and that he suffered prejudice as a result, meaning that but for counsel's deficient performance, a reasonable probability exists that the outcome at trial would have been different. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If Fitts cannot establish either deficient performance or prejudice, then we need not address the other, and his claim will not succeed. See id.

During the direct examination of Ross's father, Ross's counsel asked about his son's involvement in the March 31, 2015 shooting incident: "Did you know — did [Ross], your son, tell you anything

13

about the gun he had that day?" Ross's father responded, "I know —

as far as the gun is concerned — he [Ross] supposedly gave it back

to Fitts." The State then asked for a bench conference, during which

a discussion was held on the potential constitutional implications of

this response. The State and each defense counsel agreed to move

on after the trial court gave the jury the curative instruction: "the

previous answer that you just heard, you are instructed by the Court

to disregard that answer and not consider it as evidence in any

manner in this case. Do you understand?" Defense counsel then

resumed questioning Ross's father.

Fitts argues that because the statement made by Ross's father

violated Fitts's constitutional right under the Confrontation Clause

and Ross's defense counsel's question itself was meant to elicit

inadmissible hearsay, his own trial counsel's failure to object to this

testimony and timely move for a mistrial amounts to

constitutionally ineffective assistance of counsel.[7]

---

[7] Fitts argues in passing that Ross's father's statement violated Fitts's
rights under Article I, Section I, Paragraph XIV of the Georgia Constitution,
but Fitts does not provide any citations of authority or arguments that would

A defendant's right under the Confrontation Clause is violated under *Bruton* [*v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968),] when there is a joint trial of co-defendants and the testimonial statement of a co-defendant who does not testify at trial is used to implicate the other co-defendant in the crime or crimes on trial.

*Battle v. State*, 301 Ga. 694, 700 (4) (804 SE2d 46) (2017). In this case, there was a joint trial of co-defendants where witness testimony introduced a statement made by co-defendant Ross, who had invoked his right against self-incrimination and did not testify, that implicated his co-defendant Fitts.

However, "[t]he admission of an out-of-court statement into evidence at a criminal trial comes within the scope of the Confrontation Clause only if the statement was testimonial. A statement is testimonial if its primary purpose was to establish evidence for use in a future prosecution." (Citations and punctuation omitted.) *Reed v. State*, 307 Ga. 527, 536 (2) (c) (837 SE2d 272)

suggest a more expansive right under the Georgia Constitution than under the United States Constitution. Therefore, we restrict our analysis to his claims under the United States Constitution.

(2019). Testimonial statements include statements made to a government officer, during a police investigation or interrogation, or intended to accuse someone of a crime and produce evidence for a criminal prosecution. See *Billings v. State*, 293 Ga. 99, 104 (4) (745 SE2d 583) (2013); see also *Allen v. State*, 300 Ga. 500, 504 (3) (796 SE2d 708) (2017) (co-defendant's statements made to a third party after crimes and before arrests were not testimonial). Here, Ross made the statement shortly after the shooting incident, before any arrests, to his father rather than to police officers investigating a crime, so it was not testimonial. Thus, any objection to this testimony based on *Bruton* would have been meritless. See *Reed*, 307 Ga. at 536 (2) (c) (failure to make meritless objection does not constitute ineffective assistance of counsel).

We reach the same conclusion, but for different reasons, about Fitts's claim that his counsel should have objected to this testimony as hearsay and moved for a mistrial. Pretermitting whether it would have qualified under a hearsay exception, the statement was not admitted into evidence. Instead, upon agreement of the parties, the

trial court instructed the jury that it was to disregard Ross's father's answer to the question and to not consider it for any purpose. Moreover, at the hearing on Fitts's motion for new trial, trial counsel testified that she feared that Ross's father possessed more direct knowledge implicating Fitts and decided to agree to the instruction to disregard the testimony in order to move away from that line of questioning. We cannot say that counsel's strategic decision to refrain from objecting to a statement that was excluded and moving for a mistrial "fell outside the wide range of reasonably effective assistance, or that [Fitts] would have been granted a mistrial but for counsel's decision not to move for one." (Citations and punctuation omitted.) *Allen v. State*, 277 Ga. 502, 503 (3) (a) (591 SE2d 784) (2004). Thus, Fitts's ineffective assistance of counsel claim on this ground also fails.

### *Case No. S21A0160*

3. Franklin asserts that there was insufficient evidence both as a matter of constitutional due process and under Georgia statutory law to support her convictions for felony murder, burglary, and

armed robbery and that the trial court should have therefore granted her motion for directed verdict of acquittal. Upon reviewing the evidence presented at trial, we conclude that the evidence, while far from overwhelming, was sufficient to sustain her convictions and the trial court's denial of her motion for directed verdict.

On appeal, a criminal defendant is no longer presumed innocent, and we review whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, enabled the jury to find the defendant guilty beyond a reasonable doubt of the crimes of which she was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979); *State v. Holmes*, 304 Ga. 524, 526-527 (1) (820 SE2d 26) (2018). "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." (Citation and punctuation omitted.) *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight

of the evidence, leaving the resolution of such things to the discretion of the trier of fact." (Citation and punctuation omitted.) *Frazier v. State*, 308 Ga. 450, 452-453 (2) (a) (841 SE2d 692) (2020).

> In addition, as a matter of Georgia statutory law,
>
> [t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.

OCGA § 24-14-6. "Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." *Frazier*, 308 Ga. at 453 (2) (a). In reviewing whether the prosecution ruled out every reasonable hypothesis, we ask whether the jury was entitled to discredit alternative theories that could have explained the circumstantial evidence and to believe the State's theory of the case instead. See *Guzman-Perez v. State*, 310 Ga. 573, 576 (1) (853 SE2d 76) (2020). When considering circumstantial evidence, jurors are entitled to draw reasonable inferences "based on their own common-sense understanding of the world" that "are ordinarily

19

drawn by ordinary [people] in the light of their experience in everyday life." (Citations and punctuation omitted.) *McKie v. State*, 306 Ga. 111, 115-116 (829 SE2d 376) (2019).

Criminal liability is imposed not only where a defendant has directly committed crimes, but also where a defendant is a party to the crimes, meaning where a defendant intentionally causes another person to commit crimes, intentionally aids in the commission of crimes, or intentionally advises, encourages, hires, counsels, or procures another to commit crimes. See OCGA § 16-2-20.

> Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the direct perpetrators of the crimes. A jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with other perpetrators before, during, and after the crimes.

(Citation and punctuation omitted.) *Coates v. State*, 310 Ga. 94, 98 (849 SE2d 435) (2020).

Upon consideration of the standard of review requiring that we construe the evidence in the light favoring the jury's verdicts and principles of accomplice liability, we conclude that the evidence was

20

sufficient to show that Franklin intentionally participated in the criminal plan and was thus sufficient to sustain her convictions.[8] Moreover, even if we were to consider all of the evidence against Franklin to be circumstantial,[9] the jury was authorized to find that the evidence excluded "every other reasonable hypothesis save that

---

[8] Franklin relies on several cases where this Court reversed convictions due to the insufficiency of party-to-a-crime evidence, including *Clyde v. State*, 276 Ga. 839 (584 SE2d 253) (2003) (Clyde had motive and purchased the guns used by his cousins to commit the murder, but there was no proof he participated in the plan); *Bacon v. State*, 267 Ga. 325 (477 SE2d 122) (1996) (direct evidence of association with the murderer plus circumstantial evidence of presence during initial confrontation was insufficient without evidence of intent); *Moore v. State*, 255 Ga. 519 (340 SE2d 888) (1986) (insufficient evidence to support Steve's murder conviction where brothers Delton and Steve had motive and fled together afterward, and witness testimony supported Delton's involvement, but circumstantial evidence implicated only Steve's presence and not his intent); and *Brown v. State*, 250 Ga. 862 (302 SE2d 347) (1983) (evidence of presence at the crime scene, association with the murderer, and even approval of act short of encouragement but not intent to participate was insufficient). We need not decide if all of these cases were correctly decided, because unlike here, there was no evidence in these cases presented that the defendant agreed to or intended to participate in the crimes.

[9] If disbelieved by the jury, Franklin's testimony denying her involvement in the crime could have served as direct evidence of the opposite proposition. But we need not decide whether that is so here, nor if so, whether and how much corroborative evidence would be required to support a defendant's disbelieved testimony because the circumstantial evidence here, when construed in favor of the verdicts, is sufficient to support the verdicts the jury returned. Cf. *Daughtie v. State*, 297 Ga. 261, 263-264 (2) (773 SE2d 263) (2015) (where there is no other evidence of defendant's guilt, then jury disbelief of a defendant's testimony, alone, is insufficient to sustain a conviction).

21

of the guilt of the accused." OCGA § 24-14-6. The evidence presented authorized the jury to find that Franklin had lived at the burglarized home previously; knew of Calvin's drug-dealing and of his income tied to that business; served as a potential connection between Fitts and Calvin; planned to meet and did meet Calvin at a hotel while the crimes were being committed; communicated with Fitts on the phone shortly before and after the crimes were committed; followed Fitts to a repair shop away from Ansley's home so that they could drop off Ansley's truck, which was seen by witnesses in connection with the crimes; and gave investigators the name Donovan Ansley, with the last name of Fitts's godmother, rather than Fitts's real last name when she was first interviewed. Further, the jury was entitled to believe the State's theory and infer that Franklin rescheduled her meeting with Calvin to ensure his absence during the planned burglary; that the crimes would not have been committed without Calvin being away; that in order to mislead investigators, Franklin gave the GBI a false name for Fitts; and that Franklin continued contact with Calvin, but not their

22

sexual relationship, after the crimes in order to keep tabs on the investigation. The jury could have reasonably disbelieved Franklin's testimony that immediately before and after the crimes the jury found Fitts to have directly committed, she and Fitts spoke on the phone multiple times but only discussed how Ansley's truck needed repair; she and Fitts used Ansley's prepaid phone because his other phone, which he used throughout the same day, was broken; and her rescheduled rendezvous with Calvin was unrelated to luring Calvin away from his home during the burglary.

Regardless of whether Franklin intended that Fitts would commit the murders, for the reasons outlined above the jury was thus authorized to find that Franklin intended him to commit burglary, which created a reasonably foreseeable risk that someone would be killed. See OCGA § 16-2-6 (intent may be inferred upon consideration of conduct and circumstances); see also *Ellis v. State*, 292 Ga. 276, 279 (1) (736 SE2d 412) (2013) (defendant guilty for murder as a party to a crime because the crimes he did intend were dangerous and created a foreseeable risk of death); *Parks v. State*,

23

272 Ga. 353, 354-355 (529 SE2d 127) (2000) (same). Accordingly, Franklin's argument fails.

4. Franklin also argues that as a matter of federal constitutional due process, this Court should modify its approach to reviewing the sufficiency of the evidence under the Fourteenth Amendment and the United States Supreme Court's decision in *Jackson v. Virginia.* More specifically, Franklin argues that being convicted based on only circumstantial evidence and as a party to a crime creates too great a risk that an innocent person will be convicted of crimes he or she did not commit, and that in these cases specifically, to satisfy the demands of due process, the standard of review should allow or include a consideration of evidentiary conflicts in favor of the defendant's innocence. However, Franklin has not provided us with any legal authority to support her argument that such a balancing test is required by the Due Process Clause of the Fourteenth Amendment, as construed in *Jackson*. Without more to show how this Court's application of the *Jackson* standard of review violates Franklin's right to due process under the

Fourteenth Amendment, we will not deviate from that standard of review.

5. Franklin also argues that her trial counsel rendered constitutionally ineffective assistance. During his opening statement, Franklin's trial counsel said, "Now, . . . this case involved apparently several individuals having duplicitous sexual relationships with two different people at the same time. My client was one of them." Franklin argues that by calling her "duplicitous" during his opening statement, her trial counsel destroyed her credibility and set a negative tone for the evidence presented by Franklin throughout trial. Considering that trial counsel testified that his defense strategy was to show that Franklin was a credible, good person from a well-liked family with a steady and respectable job as a nurse, Franklin argues, her counsel's discrediting comment was a mistake that no reasonable attorney would make.

To prevail on this claim, Franklin must establish both deficient performance and prejudice under *Strickland*. To establish that her trial counsel performed deficiently, Franklin must prove that

25

counsel performed his duties "in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation and punctuation omitted.) *Watts v. State*, 308 Ga. 455, 458 (2) (841 SE2d 686) (2020). "Trial tactics or strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) Id. at 460 (2). And absent evidence to the contrary, counsel's actions are presumed strategic. See id. at 461 (2).

We see no objectively unreasonable performance in Franklin's trial counsel's comment. Trial counsel testified that, in addition to establishing that Franklin was more respectable than her co-defendants, his strategy was to show that she was not a co-conspirator but was merely caught in a love triangle that led to the crimes. Even though describing one's own client as "duplicitous" might not have been the best choice of words for counsel to use before the jury, under the circumstances, reasonable counsel could have employed that description consistent with a reasonable trial

26

strategy of acknowledging to the jury the dishonesty involved in the love triangle in which Franklin was participating. Accordingly, because Franklin cannot establish that no reasonable attorney would have made this choice under the circumstances, she has not shown that her counsel performed deficiently, and her claim of ineffective assistance fails.

6. Finally, we have identified a merger error in Franklin's sentencing. We have discretion upon our own initiative to correct merger errors when they result in illegal and void judgments of conviction and sentences. See *Dixon v. State*, 302 Ga. 691, 696-697 (4) (808 SE2d 696) (2017).

Franklin was sentenced to serve three concurrent life sentences for both felony murder counts and armed robbery and to serve twenty years consecutively for burglary. The indictment in this case did not predicate the charges of felony murder on a specific felony; instead, each charge was predicated on "the commission of at least one of the following felony offenses, to wit: burglary, armed robbery, false imprisonment, aggravated assault, and home

27

invasion." The jury did not specify which felony served as the basis for either of Franklin's convictions for felony murder. Where ambiguity exists in the jury's verdicts because the jury did not specify which of two or more felonies served as the predicate felony for a guilty verdict for felony murder, this ambiguity "must be construed in the defendant's favor." *Thompson v. State*, 263 Ga. 23, 25 (2) (426 SE2d 895) (1993), overruled on other grounds, *McClellan v. State*, 274 Ga. 819, 821 (1) (b) (561 SE2d 82) (2002).

Due to the ambiguity in the jury's verdicts, Franklin's conviction for armed robbery should have merged into one of her convictions for felony murder. See *Robertson v. State*, 268 Ga. 772, 780 (22) (493 SE2d 697) (1997) (where unclear which of armed robbery and burglary was the underlying felony for a single felony murder conviction, trial court must merge armed robbery with felony murder as the most severe in terms of potential punishment). Likewise, her conviction for burglary should have merged into her remaining conviction for felony murder.

For the reasons set forth above, we affirm Franklin's

28

convictions for felony murder, and we vacate her convictions for burglary and armed robbery, which should have merged with her felony murder convictions.

*Judgment affirmed in Case No. S21A0159. Judgment affirmed in part and vacated in part in Case No. S21A0160. All the Justices concur, except Nahmias, P. J., who concurs in judgment only as to Division 3 of Case No. S21A0160, and Melton, C. J., and McMillian, J., who dissent in Case No. S21A0160.*

MCMILLIAN, Justice, concurring in part and dissenting in part.

In these related appeals, Donovan Fitts and Jermanique Franklin appeal their convictions for murder and other crimes in connection with the shooting deaths of Tenecia Posley and Barry Johnson. The evidence that Fitts, along with an unknown male assailant, shot the victims during the course of a burglary was substantial. Therefore, I concur fully in the Court's decision in Case No. S21A0159, in which we affirm Fitts's convictions. However, it is undisputed that Franklin was not present immediately before, during, or after the shootings, and the circumstantial evidence upon

29

which this Court relies amounts to Franklin's relationship as Fitts's girlfriend at the time the crimes were committed and conduct common to such relationships like calling one another on the phone and helping take a vehicle for repairs. Because I disagree that there was sufficient evidence as a matter of Georgia statutory law and constitutional due process for a rational jury to find Franklin guilty of these crimes beyond a reasonable doubt, I respectfully dissent to this Court's judgment in Franklin's case.

The standard of review for determining the sufficiency of the evidence to support a conviction under the Due Process Clause of the Fourteenth Amendment is well-established: whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdict, enabled a rational jury to find the defendant guilty beyond a reasonable doubt of the crimes of which she was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This *Jackson v. Virginia* standard has been cited over 13,000 times in Georgia appellate courts, but rarely has the standard as described in *Jackson* been elucidated, so I revisit it here.

The *Jackson* Court explained the reason for this standard of review: "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Id. at 317 (III) (B). So "the critical inquiry" must be "after viewing the evidence in the light most favorable to the prosecution," whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at 318-19 (III) (B). In conducting this inquiry, the trier of fact is given the responsibility of fairly resolving conflicts in the testimony, weighing the evidence, and drawing "reasonable inferences from basic facts to ultimate facts." Id. at 319 (III) (B).

The inquiry is somewhat more complicated in this case because Franklin was not directly involved in the shootings and instead was prosecuted as a party to Fitts's crimes. Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the direct perpetrators of the crime, and a jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with other perpetrators before, during,

31

and after the crimes. *Coates v. State*, 310 Ga. 94, 98 (849 SE2d 435) (2020).

In addition, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Because "not every hypothesis is reasonable," the evidence "need not exclude every conceivable inference or hypothesis — only those that are reasonable." *Carter v. State*, 305 Ga. 863, 868 (2) (828 SE2d 317) (2019) (cleaned up). "Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020).

Here, "[w]hat the evidence produced by the State did *not* show were the essential links between [the defendant's] proven behavior and the crimes charged." *Clyde v. State*, 276 Ga. 839, 839 (584 SE2d 253) (2003) (emphasis in original). Evidence that a co-defendant

may have provided information or means to aid in the commission of a crime is insufficient without further evidence of criminal intent or knowledge of the criminal plan. See id. at 839-40 (defendant had motive and purchased the guns used by his cousins to commit murder but there was no proof he knowingly provided the guns to his cousins or that he otherwise participated in planning the crimes); *Moore v. State*, 255 Ga. 519, 520-21 (1) (340 SE2d 888) (1986) (insufficient evidence to support one brother's murder conviction even though both brothers had motive and fled together afterward, and even where there was circumstantial evidence of the brother's presence at the scene of the crime); *Brown v. State*, 250 Ga. 862, 864-65 (1) (302 SE2d 347) (1983) (evidence of presence, association, and even approval but not intent to participate in the crimes was insufficient).

My review reveals no case where we have affirmed a conviction as a party to a crime of a defendant who was not present during or immediately before or after the crimes based on such limited

33

circumstantial evidence as there was here.[10] The State's evidence against Franklin amounted to a girlfriend calling a boyfriend in the same time frame as he is committing crimes, Fitts and Franklin taking the truck used by Fitts for repairs, and Franklin's denials that she was involved.[11] Moreover, although the jury could have inferred from the evidence presented that Fitts knew from Franklin that Calvin would be out of the house on the morning of the murders and that he kept drugs and money there, the State failed to produce evidence that Franklin participated in planning the crimes or benefitted from the proceeds. Thus, as a matter of Georgia statutory law, this evidence in my opinion is not enough to exclude every reasonable hypothesis other than guilt. Also, because these basic

---

[10] I also note that the majority does not point to any case in which the evidence has been found sufficient under similar circumstances.

[11] The majority also notes that the jury could have disbelieved Franklin's denials of her involvement and that this could be considered direct evidence against her. See *Daughtie v. State*, 297 Ga. 261, 263 (2) (773 SE2d 263) (2015). But *Daughtie* made clear that such denials constitute substantive evidence of guilt only if some corroborative evidence exists to support the convictions, and I do not find sufficient corroborative evidence here, particularly with respect to Franklin's criminal intent.

facts proved by the State[12] would not allow a rational jury to reasonably infer that Franklin had the criminal intent to support her convictions beyond a reasonable doubt, I would conclude that the evidence was insufficient as a matter of constitutional due process and that as a result, Franklin's convictions must be reversed, and she cannot be retried. See *Jefferson v. State*, 310 Ga. 725, 726 (854 SE2d 528) (2021) (citing *Burks v. United States*, 437 U.S. 1, 16-17 (III) (98 SCt 2141, 57 LE2d 1) (1978)).

I am authorized to state that Chief Justice Melton joins this dissent.

---

[12] Suffice it to say, these kinds of basic facts such as knowing the whereabouts of your significant other with a third party, phone calls, and taking a vehicle for repairs would not be uncommon in many intimate partner relationships, so I would conclude that a rational jury could not have reasonably inferred Franklin's criminal intent from this conduct beyond a reasonable doubt.

Decided June 1, 2021 — Reconsideration denied July 1, 2021.

Murder. Warren Superior Court. Before Judge Hammond.

*Robert J. Beckwith*, for appellant (case no. S21A0159).

*Leslie S. Jones*, for appellant (case no. S21A0160).

*William P. Doupé, District Attorney, Steven T. Normandia, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.